## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

| | |
|---|---|
| MICHELE KELLER, individually and on behalf of a class of persons and entities similarly situated,<br><br><br>Plaintiff,<br><br>v.<br><br><br>LENDVIA, LLC<br><br>Defendant. | **Case No.: 6:25-cv-02982-JDA**<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ARBITRATION** |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION</u>

Plaintiff alleges that, in 2025, she received unsolicited telephone calls from Defendant Lendvia, LLC ("Defendant"), and thus proposes a national class action against Defendant under the federal Telephone Consumer Protection Act ("TCPA") and a state-wide class action under the South Carolina Telephone Consumer Privacy Protection Act ("SCTPPA"). Yet all of the claims in Plaintiff's Complaint (the "Complaint") are subject to mandatory arbitration. Electronic business records establish that on April 1, 2025, Plaintiff registered her contact and other personal information online and consented to receive such telephone calls. As relevant here, Plaintiff further agreed to binding arbitration in connection with the sign-up process, agreeing via her electronic submission: "I acknowledge, agree and consent to the Privacy Policy and Terms of Use *which includes binding arbitration* . . . ." *See* Declaration of Chase Webb at ¶¶ 10, 12 (emphasis added).

The Terms of Use, clearly visible in orange font and accessible to Plaintiff via hyperlink, contained an "Agreement to Arbitrate" providing additional terms mutually applicable to both parties. It mandated arbitration for "any and all disputes or claims that have arisen or may arise between you and [Lendvia LLC] ***including claims under 47 U.S.C. § 227 et seq. and related state statutes***, shall be resolved exclusively through final and binding arbitration, rather than in court." *See* Dec. of C. Webb at ¶ 14, and Exhibit A thereto (emphasis added). By its plain terms, this scope extends to the Complaint.

Accordingly, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), this Court should compel arbitration and dismiss Plaintiff's Complaint, or, in the alternative, issue a stay of proceedings while the arbitration takes place.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a putative class action asserting claims under the TCPA and the SCTPPA against the Defendant. The Complaint was filed on April 8, 2025, just seven (7) days after Plaintiff accessed Defendant's website and consented to be called. The Complaint arises from allegations that Defendant placed unsolicited telephone calls to Plaintiff in 2025. Compl. at ¶¶ 29–30.

**I. Defendant Stores Business Records Showing Users' Online Registration and Consent to Binding Arbitration.**

Defendant offers financial services to the public through websites and other mediums. Dec. of C. Webb at ¶ 5. At the time of the allegations in the Complaint, in 2025, prospective customers could begin applying for a loan via a three-step registration process on the Lendvia.com website. *Id.* at ¶¶ 7–17. In Step 1, online users select the amount of financing sought and the purpose of the loan based on a dropdown menu of options, as demonstrated here:



*Id.* at ¶ 8. To progress to Step 2, users click a bright orange "Continue" button at the bottom of the page. *Id.*

At Step 2, users provide their contact information, including full name, home address, social security number, and email address. *Id.* at ¶ 9. Again, to proceed to Step 3, users click a bright orange "Continue" button at the bottom of the page:



*Id.* at ¶ 9–10. As shown here, an arbitration agreement appears directly above the "Continue" button: "By clicking CONTINUE, I express my understanding and consent electronically via E-sign that I acknowledge, agree and consent to receive email marketing and the Privacy Policy and Terms of Use ***which includes binding arbitration***." *Id.* (emphasis added). The orange text of the "Privacy Policy" and "Terms of Use" contains a hyperlink which, if clicked, opens a new window that allows users to access the respective "Privacy Policy" or "Terms of Use." *Id.*

After clicking "Continue," users proceed to Step 3, which requires entry of their telephone number. *Id.* at ¶ 11. To complete the registration process, users need to check a box consenting to Lendvia's policies and click another bright orange "Submit" button:

4



*Id.*[1] Once more, the language above the "Submit" button contains an agreement to arbitrate: "By checking this box and clicking SUBMIT, I express my understanding and consent electronically via E-sign that I acknowledge, agree and consent to the Privacy Policy and Terms of Use ***which includes binding arbitration* . . . .**" *Id.* at ¶ 12 (emphasis added). The user further provides "express written consent" to be contacted by, "calls and/or texts at the phone number provided regarding scheduling and application status using any telephone dialing system, prerecorded/artificial voice

---

[1] When completing Lendvia's online form, Plaintiff Keller entered her phone number and then selected the checkbox, as seen in the screenshot. To protect Plaintiff's personal information, her phone number has been redacted, consistent with Plaintiff's publicly filed complaint.

messages and/or use of an automatic dialing device or system . . . ." *Id.* Absent agreement to these terms, a user is not allowed to register or obtain Defendant's services. *Id.* at ¶ 17.

As with Step 2, the orange text of the "Privacy Policy" and "Terms of Use" contains a hyperlink which, if clicked, opens a new window with the respective "Privacy Policy" or "Terms of Use." *Id.* at ¶ 13. The Terms of Use, attached as Exhibit A to Chase Webb's Declaration, contains a prominent disclaimer on the first page:

> **THIS TERMS OF USE AGREEMENT CONTAINS A MANDATORY ARBITRATION PROVISION, WAIVER OF JURY TRIAL AND CLASS ACTION. PLEASE REVIEW THESE PROVISIONS. If you do not agree with these terms, please do not use this Website or services.**

*Id.* at ¶ 14, Exhibit A (emphasis in original). The two-page section titled, "Arbitration Agreement & Class Action Waiver" further provides:

> **THESE TERMS PROVIDE THAT ALL DISPUTES BETWEEN YOU AND US WILL BE RESOLVED BY BINDING ARBITRATION. YOU GIVE UP OUR RIGHT TO GO TO COURT TO ASSERT OR DEFEND YOUR RIGHTS, YOU ALSO GIVE UP YOUR RIGHT TO PARTICIPATE IN OR BRING CLASS ACTIONS. YOUR RIGHTS WILL BE DETERMINED BY NEUTRAL ARBITRATORS AND NOT A JUDGE OR A JURY.**
>
> **You agree that any and all disputes or claims that have arisen or may arise between** . . . Lendvia LLC . . ., including claims under 47 U.S.C. § 227 et seq. and related state statutes, shall be resolved exclusively through final and binding arbitration, rather than in court, except if your claims are under $1000.00 you may assert claims in small claims court, if your claims qualify.

*Id.* at ¶ 14, Exhibit A at 5–6 (emphasis in original). This Agreement to Arbitrate further provides users, in lay terms, with an overview of basic arbitration procedures and states that the arbitration will be conducted by JAMS under its rules pertaining to Consumer-Related Disputes. *Id.* at ¶ 15, Exhibit A at p. 6. The Agreement to Arbitrate further includes what is referred to as a "delegation clause" providing that the arbitrator "shall have exclusive authority to resolve any dispute arising

out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate." *Id.* at ¶ 16, Exhibit A at p. 6.

The Terms of Use also include a Class Action Waiver, which expressly prohibits users from pursuing claims as a class or collective action. Specifically, the agreement states that "you and we agree that each may bring claims against the other . . . only on an individual basis and not as a plaintiff or class member in any purported class or representative action or proceeding." *Id.* at ¶ 14, Exhibit A at p. 6. Additionally, the Terms of Use contain a Release of Claims provision, which bars users from asserting certain claims once they have agreed to the terms. *Id.* These provisions further underscore the binding nature of the arbitration agreement and the scope of relief available in arbitration.

## II. Plaintiff Completed the Online Registration Process and Consented to the Agreement to Arbitrate.

Business records conclusively establish that Plaintiff completed this three-step registration process and consented to arbitrate her TCPA and SCTPPA claims asserted here.

### A. Defendant Stores Business Records of Users' Online Registrations.

Defendant keeps internal records pertaining to all users who complete the three-step process on the Lendvia.com website. *See* Dec. of C. Webb at ¶¶ 18–23. These records show the date and time of user activity, the URL for the website visited, other associated metadata, and a video replay of the form submission showing users' exact website activity during the submission process (inputs, mouse movements, and clicks). *Id.* at ¶ 18.

Such information is contained on a proof-of-consent form known as a "Verified Consent." *Id*. To create these records, Defendant has engaged the Verified Consent company, an independent internet lead certification authority that specializes in the online verification of third-party proof

of consent. *Id.* at ¶ 19. The creation of these records is an automated process that occurs contemporaneously with sign-up based on the user's actions and input. *Id*. The recordings generated by Verified Consent are stored on secure servers maintained by Verified Consent. Dec. of C. Webb at ¶ 23. The Verified Consent ensures Defendant has obtained their users' consent prior to contacting them precisely to avoid disputes such as this one. Reliance on the Verified Consent form, generated through the routine services of the Verified Consent company, is part of the regular course of Defendant's business activities. *See id.*

**B.     Verified Consent Confirms that Plaintiff Consented to Arbitration and the Terms of Use.**

The Verified Consent here definitively establishes that, on April 1, 2025, Plaintiff completed each and every one of the three steps described above. *Id.* at ¶¶ 25–33; and Exhibits B and C thereto. In support of this motion, Defendant has submitted the Declaration of Chase Webb, the Vice President of Business Strategy at Lendvia LLC. Exhibits B and C to Mr. Webb's Declaration together comprise the Verified Consent for Plaintiff, respectively consisting of a Certificate of Authenticity and a video replay of Plaintiff's exact website activity during the submission process. Dec. of C. Webb at ¶¶ 26–27. The video replay shows the following web activity from Plaintiff.

First, at Step 1, Plaintiff expressed interest in borrowing $11,000 and selected the loan purpose as "Moving loan" from the available drop-down options:



Dec. of C. Webb at ¶ 28.

After clicking "Continue," Plaintiff proceeded to Step 2. She filled in her contact information, which included sensitive personal information—namely, her first and last name, home address, social security number, and email address—confirming that Plaintiff was, in fact, the individual who registered:[2]

---

[2] Plaintiff's social security number and street address has been redacted for confidentiality purposes.




*Id.* at ¶¶ 27–28.[3] Again, Plaintiff clicked "Continue," which established her "express understanding and consent that Plaintiff acknowledged, agreed, and consented to the Privacy Policy and Terms of Use *which includes binding arbitration*." *Id.* at ¶ 29 (emphasis added).

---

[3] Although Plaintiff used the name 'Manda Keller' during registration, the Verified Consent records confirm her identity through the matching phone number and other personal information. The alias does not negate her consent to arbitration.

Plaintiff then proceeded to Step 3, where she entered her telephone number, affirmatively checked the box to acknowledge her understanding and consent to the associated terms, and clicked "Submit":



*Id.* at ¶ 30. Again, in clicking "Submit," Plaintiff gave a second "express understanding and consent that Plaintiff acknowledged, agreed, and consented to the Privacy Policy and Terms of Use *which includes binding arbitration*." *Id.* at ¶ 31 (emphasis added).

In sum, Plaintiff, at both Steps 2 and 3, acknowledged, agreed, and consented to "binding arbitration" and agreed to the hyperlinked Terms of Use described above. *See Id.* at ¶¶ 29–31. In light of this consent, the Complaint must be compelled to arbitration.

# ARGUMENT

## I.    Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs this dispute. The Agreement to Arbitrate states "[t]he Federal Arbitration Act governs the interpretation and enforcement of this Agreement to Arbitrate section." Dec. of C. Webb at ¶ 14, and Exhibit A thereto.

The Fourth Circuit recognizes the strong federal policy favoring arbitration agreements. *Nat'l Home Ins. Co. v. Bridges*, 142 F. Supp. 3d 425, 429 (D.S.C. 2015), citing *Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir. 2002). "A district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Nat'l Home Ins. Co.*, 142 F. Supp. 3d at 429, citing *Adkins*, 303 F.3d at 500. Specifically, a litigant can compel arbitration under the FAA if it can demonstrate: 1) the existence of a dispute between the parties, 2) a written agreement that includes an arbitration provision that purports to cover the dispute, 3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and 4) the failure, neglect, or refusal of the defendant to arbitrate the dispute. *Id.*

Under the FAA, a written agreement to arbitrate contained in any "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable and enforceable." 9 U.S.C. § 2. "The Supreme Court has repeatedly emphasized that the FAA represents 'a liberal federal policy favoring arbitration agreements.'" *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 273 (4th Cir. 1997) (citing *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)). "Pursuant to that liberal policy, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract

language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *Id.* at 273–74 (quoting *Moses H. Cone*, 460 U.S. at 24–25). In addition, the FAA, by its own terms, applies to all contracts involving interstate commerce. *Allied-Bruce Terminix Cox., Inc. v. Dobson*, 513 U.S. 265, 281 (1995). This matter involves interstate commerce because, among other reasons, the parties are in different states, and all of the actions that are the subject of Plaintiff's complaint transpired across state lines. Compl. at ¶¶ 3–5, 7–8, 22–31.

## II.     Plaintiff's Claims Are Subject to Mandatory Arbitration.

This case meets all four requirements for mandatory arbitration. There is a clear dispute between the parties, as evidenced by Plaintiff filing her Complaint, and as further explained below, the Complaint is within the scope of the arbitration agreement. The Complaint also demonstrates that Plaintiff is refusing to arbitrate. The requirement for a relationship to interstate commerce is also easily satisfied. A relationship with interstate commerce has been found in similar cases, where parties are required to correspond across state lines. *See, e.g.*, *Allied-Bruce Terminix Cos.*, 513 U.S. at 265; *see also Nat'l Home Ins. Co.*, 142 F. Supp. 3d at 432. Here, Plaintiff received the alleged telephone calls at her South Carolina telephone number, where Plaintiff resides, and the alleged contact was made by a California-based entity. *See* Compl. at ¶¶ 7–8, 25. The relationship to interstate commerce is evident. And as is clear from Plaintiff's own interactions with Defendant's website, there exists a valid written arbitration agreement that covers this dispute.

### A.     The Complaint Is Within the Scope of the Agreement to Arbitrate.

The Complaint asserts claims that plainly fall within the scope of the Agreement to Arbitrate. The Agreement to Arbitrate applies mutually to the parties. It encompasses "any and all disputes or claims . . . , ***including claims under 47 U.S.C. § 227 et. seq. and related state statutes*** . . . ." *See* Dec. of C. Webb at ¶ 14, Exhibit A. The Agreement to Arbitrate states in multiple places,

often highlighted by bold and capitalized text, that Plaintiff was agreeing to resolve disputes "exclusively through final and binding arbitration" and was giving "up [her] right to go to Court" for disputes resulting from Plaintiff's use of or access to Defendant's website and services, including for claims derived under the TCPA and analogous state statutes. *Id.*, Exhibit A at p. 8.

The Complaint falls within this scope for multiple reasons. To the extent Plaintiff ever received any telephone calls from Defendant or a third-party on Defendant's behalf, those calls occurred as a result of Plaintiff's access and use of Defendant's website, including her submission of her telephone number and multi-step consent to receive communications about Defendant's services. *See* Dec. of C. Webb at ¶¶ 28–33. Moreover, her claims as alleged arise out of telephone calls offering Defendant's services as a result of Plaintiff's loan inquiry and application. Compl. at ¶¶ 23–30. As a result, Plaintiff's TCPA and SCTPPA claims falls squarely within the scope of the Agreement to Arbitrate, particularly given the Fourth Circuit's broad application of such provisions. *See, e.g.*, *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (finding that the plaintiff's TCPA claims about advertising calls fell within scope of arbitration agreement).

Not only does the Agreement to Arbitrate encompass Plaintiff's claims, but it also includes a Class Action Waiver, which forecloses Plaintiff's ability to pursue this matter on a class-wide basis. Courts routinely enforce such waivers, particularly where, as here, the waiver is clearly stated and mutually applicable. *See, e.g.*, *York v. Dodgeland of Columbia, Inc.*, 749 S.E.2d 139, 153 (S.C. Ct. App. 2013) (upholding class action waiver). If the Court grants Defendant's motion, Defendant intends to promptly move to strike the class allegations pursuant to the waiver. *See Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 684 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so."). This will likely result in a streamlined proceeding.

14

### B.     The Agreement to Arbitrate is Valid and Enforceable on Plaintiff.

Plaintiff's consent to arbitrate, while signing up to receive loan services, was a valid and binding agreement. Courts have identified a number of variations of online, electronic agreements that can constitute the formation of a valid contract. *See, e.g.*, *Marshall v. Georgetown Memorial Hospital*, 112 F.4th 211, n.6 (4th Cir. 2024) (explaining distinctions in internet contract terminology, including "clickwrap," "browsewrap," "sign-in wrap," and "scrollwrap" agreements) (citing *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021)). To the limited extent that South Carolina courts have considered the validity of internet contracts, "[m]ost courts have concluded that clickwrap agreements are valid, enforceable contracts and have concluded that by affirmatively clicking an 'I Agree' box, a party demonstrates acceptance of these contracts in accordance with the posted terms." *Rock v. Solar Rating & Certification Corp.*, Case No. 8:17-cv-3401-DDC-JDA, 2018 WL 3750617, at *5 (D.S.C. July 23, 2018); *see also Church v. Hotels.com L.P.*, Case No. 2:18-0018-RMG, 2018 WL 3130615, at *2–3 (D.S.C. June 26, 2018) (finding that a hybrid "clickwrap" and "browsewrap" agreement was valid).

Similar to clickwrap and browsewrap agreements, "'[s]ign-in-wrap' agreements are those in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service." *Selden v. Airbnb, Inc.*, No. 16-CV-00933 (CRC), 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016), *aff'd*, 4 F.4th 148 (D.C. Cir. 2021); *see also Marshall*, 112 F.4th at n.6 (referring to "sign-in wrap" agreements as "a hybrid of clickwrap and browser wrap agreements") (internal citations omitted). As relevant here, "[a] 'clickwrap' agreement is one in which a user accepts a website's terms of use by clicking an 'I agree' or 'I accept' button, with a link to the agreement readily available." *Selden v. Airbnb*, 2016 WL 6476934, at *4. However, "[w]hile a link to the separate agreement is

15

provided, users are not required to indicate that they have read the agreement's terms before signing up." *Id.*

Courts generally enforce the arbitration provisions contained in both clickwrap and sign-in wrap agreements, especially courts within the Fourth Circuit. *See, e.g.*, *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683 at n.8. (E.D. Va. 2020).[4] When analyzing arbitration requirements contained within terms of use, courts consider various factors to determine whether the user had reasonable notice that she was agreeing to those terms and conditions. *Id.* at 697. These factors include (1) whether the terms and conditions were provided in a hyperlink and whether the hyperlink was conspicuous to the user, (2) the placement of the terms and conditions in relation to the button that grants a user access, (3) whether the terms and conditions appeared on multiple occasions, and (4) the overall design elements of the website, including the font size and color, that may hinder a user's reasonable notice. *Id.*

To illustrate, in *Austin v. Experian Information Solutions Inc.*, the Fourth Circuit reversed the district court's denial of a motion to compel arbitration where the plaintiff had enrolled in a free credit monitoring service through an Experian affiliate. No. 23-2301, 2025 WL 2177331, at *8–10 (4th Cir. Aug. 1, 2025). The court held that the plaintiff had reasonable notice of and assented to the arbitration agreement embedded in the Terms of Use. *Id.* The enrollment page

---

[4] *See also, e.g.*, *Rock v. Solar Rating & Certification Corp.*, 2018 WL 3750617, at *5 (enforcing click wrap arbitration agreement plaintiff signed using a digital signature); *see also Am. Eagle Motors, LLC v. Copart of Connecticut, Inc.*, Case No. 122CV656RDAJFA, 2023 WL 123503, at *3 (E.D. Va. Jan. 5, 2023) (enforcing forum selection clause contained in click-wrap agreement); *Beard v. John Hiester Chevrolet, LLC*, 640 F. Supp. 3d 420, 430 (E.D.N.C. 2022) (finding that click-wrap agreement constituted sufficient express written consent for contact via telephone under the TCPA); *Hosseini v. Upstart Network, Inc.*, No. 19-CV-704, 2020 WL 573126, at *4 (E.D. Va. Feb. 5, 2020) ("In fact, many courts have found clickwrap agreements to be enforceable."); *Kraft Real Estate Inv., LLC v. Homeaway.com, Inc.*, No. 4:08-cv-3788, 2012 WL 220271, at *7 (D.S.C. Jan. 24, 2012) (collecting cases on propriety of clickwrap agreements); *see also Hancock v. AT&T Co., Inc.*, 701 F.3d 1248. 1256 (10th Cir. 2012) ("Clickwrap agreements are increasingly common and have routinely been upheld." (internal quotations omitted)).

clearly stated, in bold text directly above the "Create Your Account" button, that by clicking the button, the user agreed to the Terms of Use, which were hyperlinked in blue text. *Id.* at *8. The court emphasized that the design and layout of the page made the arbitration terms conspicuous and accessible, and concluded that the plaintiff manifested assent by clicking the button after being clearly informed that doing so constituted agreement to the terms, including arbitration. *Id.* at *9–10.

Here, the arbitration requirement was even more transparent than in *Austin* and similar clickwrap case law compelling arbitration. Plaintiff was expressly informed—at multiple points during the sign-up process—that clicking "Submit" constituted agreement to binding arbitration. Unlike in *Austin*, where the arbitration clause was accessible via hyperlink, the arbitration language here is embedded directly in the text above the "Submit" and "Continue" buttons, eliminating any need to click through to another page. *See* Dec. of C. Webb at ¶¶ 7–17:



*See* Dec. of C. Webb at ¶¶ 7–17. Moreover, the Terms of Use, as in *Austin*, prominently discloses an agreement to arbitrate through capitalized, bold font and in several places throughout the document. Thus, the arbitration requirement here was even more visible than the numerous clickwrap and sign-in wrap agreements courts have upheld where the arbitration provision was contained only within a separate hyperlinked page.

Moreover, the hyperlinked Terms of Use were presented in orange text, placed immediately above the "Submit" button, and appeared on sequential pages during the sign-up process. The design of the page made the arbitration provision independently distinct and clearly visible. Thus, Plaintiff had even more conspicuous notice and clearer manifestation of assent than in *Austin*, where the court upheld arbitration based on less direct presentation of the terms. Therefore, as a valid and enforceable agreement, Plaintiff's claims must be compelled to arbitration.

### C.     Any Dispute Over the Validity or Scope of the Agreement to Arbitrate Must be Resolved by the Arbitrator under the Delegation Provision.

To the extent there is any dispute as to whether the Agreement to Arbitrate is enforceable or Plaintiff's TCPA and SCTPPA claims fall within its scope, the Agreement to Arbitrate contains a delegation clause that provides for such issues to be resolved by an arbitrator in the first instance:

> The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement to Arbitrate, any part of it, or of this Agreement including, but not limited to any claim that all or any part of the Agreement to Arbitrate or this Agreement is void or voidable.

*See* Dec. of C. Webb at ¶ 16 and Exhibit A thereto.

Courts routinely uphold such provisions. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 1586 U.S. 63, 69 (2019); *Singh v. Anesthesia Assoc. of Rock Hill*, C/A No. 0:25-cv-

18

0696-CMC-SVH, 2025 WL 1378693, at *6–7 (D.S.C. May 13, 2025) ("[P]arties may agree to have the arbitrator decide [the validity and scope of an arbitration provision] if their [arbitration] agreement does so by 'clear and unmistakable evidence.'") (quoting *Henry Schein, Inc.*, 1586 U.S. at 69). Moreover, the Fourth Circuit has held that when contracting parties' express incorporation of the JAMS rules in the agreement—as in the Terms of Use here—it is clear evidence of an intent to delegate questions of arbitrability to the arbitrator. *See Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527–28 (4th Cir. 2017) (noting that JAMS rules provide for the arbitrator to decide arbitrability), *abrogated on other grounds by Harry Schein, Inc.*, 586 U.S. 63 (2019).

###### D.     The Case Should be Dismissed or, Alternatively, Stayed Pending Arbitration

The FAA typically requires a district court, upon motion by any party, to stay judicial proceedings involving issues covered by written arbitration agreements. *See* 9 U.S.C. § 3.  The Fourth Circuit has stated that "[n]otwithstanding the terms of § 3, however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001); *see also Greenville Hosp. Sys. v. Emp. Welfare Ben. Plan for Emps. of Hazelhurst Mgmt. Co.*, 628 F. App'x 842, 845–46 (4th Cir. 2015). Here, the Court should dismiss the case in its entirety because all of Plaintiff's claims are covered by the valid and enforceable Agreement to Arbitrate. In the alternative, this case should be stayed pending arbitration pursuant to the FAA.

### III.     Conclusion

In light of the binding arbitration agreement, the class action waiver, and the release of claims, Defendant respectfully requests that the Court compel arbitration and dismiss the

Complaint in its entirety. Alternatively, the Court should stay the proceedings pending arbitration, where Defendant will seek immediate dismissal of the class claims.

This 14th day of August, 2025.

Respectfully submitted,

s/ Susie J. Lloyd

Susie J. Lloyd (Fed. Bar No. 12181)
Christopher B. Henry (*pro hac vice admission forthcoming*)
Email: susielloyd@parkerpoe.com
Email: chrishenry@parkerpoe.com
PARKER POE ADAMS & BERNSTEIN LLP
620 S. Tryon Street, Suite 800
Charlotte, NC 28202
Tel: (704) 335-9843

Brent R. Phillips (*pro hac vice forthcoming*)
PHILLIPS LAW CORPORATION
801 Parkcenter Drive, Suite 105
Santa Ana, CA 92705
Tel: (714) 573-4087
bphillips@phillipslawcorporation.com

*Attorneys for Defendant LENDVIA, LLC*

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing document was filed using the Court's CM/ECF system

which will automatically send notice of the same to all parties of record:

/s/ *Susie Lloyd*
Susie Lloyd