UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| MICHELE KELLER, individually and on behalf of a class of all persons and entities similarly situated,<br><br>      Plaintiff<br><br>vs.<br><br>LENDVIA, LLC<br><br>      Defendant. | C/A No.: 6:25-cv-02982-JDA |

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION TO COMPEL ARBITRATION**

Plaintiff Michele Keller respectfully submits this memorandum of law in opposition to Defendant LendVia, LLC's ("LendVia") Motion to Compel Arbitration (ECF No. 22). LendVia's motion is an exercise in fiction, predicated on fabricated evidence and a litigation strategy that has been deployed—and challenged—in federal courts across the country. The motion fails on multiple, independent grounds and must be denied.

- **First**, the motion is defeated by its own timeline. LendVia seeks to compel arbitration of claims that accrued on March 19, 2025, but alleges Ms. Keller consented to arbitration thirteen days later, on April 1, 2025. An arbitration clause cannot reach back in time to cover disputes that have already ripened into complete causes of action, a temporal impossibility that is legally dispositive.

- **Second**, no valid agreement to arbitrate was ever formed. Arbitration is a matter of consent, and Ms. Keller unequivocally denies ever visiting LendVia's website or even knowing that the company existed before its illegal calls. Her sworn testimony is corroborated by overwhelming and conclusive technical evidence from a cybersecurity

1

expert, who establishes that the alleged website visit is a geographic, telephonic, and technological impossibility.

- **Third**, even if this Court were to assume an agreement existed, it is an unconscionable contract of adhesion that is unenforceable under California law, which here controls. The agreement is procedurally unconscionable as a take-it-or-leave-it contract with hidden terms, and substantively unconscionable because it illegally attempts to waive Ms. Keller's right to seek public injunctive relief, in direct violation of the rule established in *McGill v. Citibank*.

- **Fourth**, and most concerningly, this is not an isolated incident. LendVia has engaged in a nationwide pattern of presenting the same fabricated "Verified Consent" evidence in other jurisdictions, where consumers have universally denied visiting or even knowing of the existence of the websites upon which LendVia based consent. Courts facing this exact scenario have recognized the genuine dispute over contract formation and have either denied LendVia's motions or permitted discovery, a course this Court should follow.

For these reasons, and as detailed below, the motion must be denied.

## I. STATEMENT OF FACTS

**A. LendVia's Illegal Calls Preceded Any Alleged "Consent" by Thirteen Days**

Ms. Keller, a resident of South Carolina, has had her cellular telephone number registered on the National Do Not Call Registry for several years. (27-1, Keller Aff. ¶ 25). Despite this, LendVia began a campaign of unsolicited telemarketing calls to her phone.

- **March 19, 2025:** Ms. Keller received the first unsolicited call from a Delaware number. The caller, identifying as "US Loan Services," left a pre-recorded voicemail about a "personal loan preapproval offer." (Keller Aff. ¶ 10 re: Exhibit A, Voicemail Text, ECF 27-2).

- **March 25, 2025:** After a second call, Ms. Keller spoke with a representative named "Ryan." When pressed for his company's identity, Ryan reluctantly disclosed a partnership with "LendVia," a name that "meant nothing to" Ms. Keller. (Keller Aff. ¶ 11; Exhibit B, Call Recording [ECF 27-3]). The caller admitted he could be "kicked out" for revealing the name, demonstrating a deliberate effort to conceal LendVia's identity. (Keller Aff. ¶ 11; Exhibit B).

LendVia does not dispute this timeline. Instead, its entire motion is premised on the claim that Ms. Keller visited its website and consented to arbitration on **April 1, 2025**—thirteen days after the initial illegal calls began. (Declaration of Chase Webb ("Webb Decl.") ¶ 26).

**B. Ms. Keller Unequivocally Denies Visiting LendVia's Website or Consenting to Its Terms**

Ms. Keller swears under oath: "I have never, at any time, visited the website shown in this video, nor have I ever visited any LendVia website." (Keller Aff. ¶ 5). She further attests she "would never input [her] personal information—let alone [her] social security number—into an unfamiliar website" from a company she "did not fully know and trust." (Keller Aff. ¶ 8). Moreover, LendVia's claim that she applied for an $11,000 "moving loan" is absurd. (Webb Decl. ¶ 28). Ms. Keller has lived in her home since 2019 with a 3% mortgage rate and has no intention of moving. (Keller Aff. ¶¶ 23-24). At the exact time of the alleged website visit—8:48 AM on April 1, 2025—Ms. Keller, a medical flight nurse, "would have been actively engaged at work, or commuting from Clinton to Spartanburg," and attests she "would never visit ANY website while driving." (Keller Aff. ¶¶ 14-16).

**C. Expert Analysis Shows LendVia's Evidence is Fabricated**

A comprehensive forensic analysis by cybersecurity expert Markel Samuel establishes, through multiple independent lines of inquiry, that the alleged website activity is a technical and physical impossibility. (ECF No. 27-4, Samuel Declaration).

3

1. **Geographic Impossibility:** The IP address LendVia attributes to Ms. Keller (174.215.128.233) geolocates to Buffalo, New York. (Samuel Decl. ¶¶ 12-13). On that date and time, Ms. Keller was physically located over 650 miles away in South Carolina. (Keller Aff. ¶¶ 13-14; Samuel Decl. ¶ 14). She has "never, in [her] life, been to Buffalo, New York." (Keller Aff. ¶ 19).

2. **Carrier Impossibility:** The IP address is registered to Verizon Communications Inc. (Samuel Decl. ¶ 11). Ms. Keller's mobile service is with AT&T FirstNet, a specialized and secure network exclusive to first responders. (Keller Aff. ¶ 16; Samuel Decl. ¶ 15). Mr. Samuel concludes it is "technically impossible for an AT&T customer to generate internet traffic that would appear to originate from a Verizon-owned IP address" under normal circumstances. (Samuel Decl. ¶ 19). Ms. Keller does not use VPNs or other network obfuscation tools. (Keller Aff. ¶ 21).

3. **Device Impossibility:** Device fingerprinting analysis shows the device used for the alleged visit was an iPhone 6s with a screen resolution of 750x1334. (Samuel Decl. ¶¶ 21-25). Ms. Keller owns an iPhone 13 Pro with a screen resolution of 2532x1170. (Samuel Decl. ¶ 24; Keller Aff. ¶ 20). As Mr. Samuel states, "Simply put, the device purported by LendVia to be Ms. Keller's is not her phone." (Samuel Decl. ¶ 25).

4. **Fabricated Video Evidence:** The video file LendVia submitted as "proof" was not a secure, contemporaneous recording of user activity. It was created with TechSmith Camtasia video editing software, as evidenced by a Camtasia project identifier ("Manda_Keller_Cert_01") in the file's metadata. (Samuel Decl. ¶ 43). The video lacks any chain of custody, digital signatures, or other foundational elements required for authentication under Federal Rule of Evidence 901. (Samuel Decl. ¶ 43).

5. **Absence of Digital Footprint:** A forensic examination of Ms. Keller's iPhone 13 Pro and iCloud data found "no evidence of any downloads of LendVia or any similar loan-related applications" and "no evidence that an account was ever created with LendVia." (Samuel

4

Decl. ¶ 30). The examination of browser histories, cache files, and network activity logs revealed no trace of any interaction with LendVia.com. (Samuel Decl. ¶¶ 27-30).

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") requires a court to first determine "(1) whether a valid agreement to arbitrate exists and (2) whether the dispute falls within the scope of that arbitration agreement." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 288 (4th Cir. 2020). "[A] court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute. "Accordingly, '[b]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010).

If the very "making of the agreement for arbitration" is "in issue," the FAA requires the court to "proceed summarily to the trial thereof." 9 U.S.C. § 4; *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002). In such proceedings, the party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

## III. ARGUMENT

### A. LendVia Cannot Compel Arbitration of Disputes That Arose Before the Alleged Agreement Was Formed.

Even if this Court were to accept LendVia's fabricated evidence as true, its motion fails as a matter of law. The TCPA violations alleged in the Complaint began on March 19, 2025. LendVia claims the agreement to arbitrate was formed on April 1, 2025. An arbitration clause cannot retroactively apply to disputes that have already accrued.

Arbitration agreements, like all contracts, are generally not retroactive unless expressly made so. See, *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 669 (6th Cir. 2003). The

5

Supreme Court has reinforced this principle, stating that arbitration clauses "do not automatically encompass all disputes between the parties." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 300 (2010). A party cannot be required to arbitrate a dispute it has not agreed to submit. *American Bankers Ins. Group v. Long*, 453 F.3d 623, 626-27 (4th Cir. 2006).

Ms. Keller's TCPA claims crystallized the moment she received the first unwanted call on March 19, 2025. A violation of the TCPA is complete upon the making of the illegal call. *See Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 271 (3d Cir. 2013). Any purported agreement made thirteen days later is irrelevant to those pre-existing claims. This temporal impossibility is legally dispositive and requires the denial of LendVia's motion.

### B. No Valid Agreement to Arbitrate Was Ever Formed.

LendVia's motion fails for a reason more fundamental than its temporal defects: Ms. Keller never visited its website, never saw its terms, and never consented to anything. Arbitration is strictly "a matter of consent, not coercion," a "first principle that underscores all of our arbitration decisions." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010)). Accordingly, where a party challenges the very existence of a contract containing an arbitration clause, the court—not an arbitrator—must first resolve the issue of contract formation. *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010).

The FAA mandates that if the "making of the agreement for arbitration . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. To put formation "in issue," a party must "unequivocally deny" that an agreement was made and "produce some evidence to substantiate the denial." *Doctor's Assocs., Inc. v. Jabush*, 89 F.3d 109, 114 (2d Cir. 1996). Ms. Keller has far exceeded this standard. She has not only unequivocally denied the existence of any agreement but has substantiated that denial with overwhelming factual and expert evidence proving that LendVia's claim of consent is a technical and physical impossibility.

6

1. **Ms. Keller Has Unequivocally Denied the Existence of Any Agreement and Substantiated her Denial with Conclusive Evidence.**

Ms. Keller's sworn affidavit provides a clear and unequivocal denial: "I have never, at any time, visited the website shown in this video, nor have I ever visited any LendVia website." (Keller Aff. ¶ 5). She further attests that she "would never input [her] personal information—let alone [her] social security number—into an unfamiliar website" from a company she "did not fully know and trust." (Keller Aff. ¶ 8).

This is not a mere failure of recollection. Ms. Keller's denial is substantiated by objective facts that render LendVia's narrative absurd. LendVia claims she sought an $11,000 "moving loan," yet Ms. Keller has lived in her home since 2019 with a low mortgage rate and has no intention of moving. (Keller Aff. ¶¶ 23-24) **7**. Her unfamiliarity with LendVia is proven by the audio recording of her call with "Ryan," where she required him to spell the name "LendVia" multiple times because she had never heard of it. (Keller Aff. ¶ 11; Ex. B).

Most critically (and concerningly), Ms. Keller's denial is corroborated by the expert declaration of cybersecurity professional Markel Samuel, whose analysis establishes that the alleged website visit is a technical impossibility. This is not a simple factual dispute; it is a matter of objective, verifiable proof. Mr. Samuel's forensic examination revealed:

- **Geographic Impossibility:** The IP address LendVia attributes to Ms. Keller geolocates to Buffalo, New York, while Ms. Keller was physically located over 650 miles away in South Carolina. (Samuel Decl. ¶¶ 13-14, 51).

- **Carrier Impossibility:** The IP address is registered to Verizon, but Ms. Keller's mobile service is with AT&T FirstNet. It is "technically impossible for an AT&T customer to generate internet traffic that would appear to originate from a Verizon-owned IP address" under normal circumstances. (Samuel Decl. ¶¶ 15, 19, 51).

7

- **Device Impossibility:** The device fingerprint shows an iPhone 6s, but Ms. Keller owns an iPhone 13 Pro—two devices with fundamentally different hardware and screen resolutions. (Samuel Decl. ¶¶ 24-25, 33, 51).
- **Absence of Digital Footprint:** A comprehensive forensic examination of Ms. Keller's devices and accounts found zero evidence of any visit to LendVia.com, no downloads of its app, and no related browser history, cache files, or network activity. (Samuel Decl. ¶¶ 27, 30, 34, 51).

As Mr. Samuel concludes, this evidence establishes "objective impossibilities that cannot be overcome through testimony, conjecture, or argument." (Samuel Decl. ¶ 52). The person who allegedly visited LendVia's website (if anyone) was not Ms. Keller.

**2. LendVia's Purported Evidence of Consent is Unauthenticated and Inadmissible.**

Against this mountain of contradictory evidence, LendVia relies entirely on its "Verified Consent" records, including a purported video of the website interaction. This "evidence" is inadmissible because LendVia cannot satisfy the foundational requirements for authentication under Federal Rule of Evidence 901.

The proponent of digital evidence must produce "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This requires establishing the reliability of the system and the accuracy of the data collection methods. *See In re Vee Vinhnee*, 336 B.R. 437, 444-45 (B.A.P. 9th Cir. 2005) (requiring foundational testimony on a party's computer system for electronic business records). LendVia has failed to provide any such foundation.

Mr. Samuel's analysis reveals that LendVia's evidence is inherently unreliable:

- **It is Not a Secure Recording:** The video file contains a Camtasia project identifier ("Manda_Keller_Cert_01"), proving it is not a secure, contemporaneous recording but an exported screen capture created with video editing software. (Samuel Decl. ¶¶ 37 - 43).

- **It Lacks Foundational Elements:** The file has no chain of custody, no embedded digital signatures linking it to Ms. Keller's device, and no documentation of system reliability. (Samuel Decl. ¶ 43).[1]
- **It is a Generic, Editable File:** The video "represents only a generic, exportable screen recording that could have been produced by any individual with access to Camtasia." (Samuel Decl. ¶ 43(f)).

LendVia offers no testimony from a witness with personal knowledge of the recording process, no documentation of data integrity, and no evidence that its "Verified Consent" system produces an accurate result. (Samuel Decl. ¶ 43(e)). Its self-serving declarations from employees like Chase Webb and third-party vendors like Kashif Ali, who lack personal knowledge of this specific event, cannot authenticate a demonstrably fabricated record. Without proper authentication, the video and associated records must be excluded.

Because Ms. Keller has unequivocally denied the existence of an agreement and has substantiated that denial with overwhelming evidence of impossibility and fabrication, the formation of the arbitration agreement is squarely "in issue." LendVia has failed to carry its burden of proving the existence of a valid agreement by a preponderance of the evidence. Accordingly, the motion to compel arbitration must be denied.

### C. In the Alternative, the Purported Agreement is an Unconscionable Contract of Adhesion that is Unenforceable under Governing Law.

---

[1] Additionally, the Defendants' supporting affidavits and declarations continually make the assertion – under oath – that it was "Keller" that visited the site and input information. None of LendVia's declarants or affiants, however, could actually have personal knowledge of that fact as, even if they could show that it was Keller's device that used to access LendVia's site (which appears impossible). For example, Chase Webb's sworn assertions that he knows Ms. Keller personally performed these actions constitute perjury unless he has personal knowledge—which he clearly cannot have—of the website visitor's identity.

Even if this Court were to find that some form of agreement existed—a premise Ms. Keller vehemently denies and the evidence refutes—the purported arbitration clause would still be unenforceable as an unconscionable contract of adhesion. Under the FAA, generally applicable state-law contract defenses, such as unconscionability, may invalidate an arbitration agreement. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). Because LendVia is a California company and the alleged contract was presented through its California-based operations, California law governs the unconscionability analysis. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (courts apply state-law principles to determine contract validity).

Under California law, unconscionability has both a procedural and a substantive element. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). Procedural unconscionability focuses on "oppression" or "surprise" due to unequal bargaining power, while substantive unconscionability focuses on "overly harsh" or "one-sided" results. *Id.* The two work on a sliding scale: the more substantively oppressive the terms, the less evidence of procedural unconscionability is required to find the agreement unenforceable, and vice versa. *Id.* Here, LendVia's purported agreement is rife with both.

**1. The Agreement is Procedurally Unconscionable.**

Procedural unconscionability is overwhelmingly present. The analysis begins with whether the contract is one of adhesion, which is itself a finding of procedural unconscionability. *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001). An adhesion contract is a standardized contract, imposed and drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it. *Armendariz*, 24 Cal. 4th at 113.

That is precisely the case here. LendVia, a sophisticated financial services company, drafted the Terms of Use and presented them on a take-it-or-leave-it basis. A consumer seeking a

loan has no power to negotiate these terms; the only choice is to click "Continue" or abandon the process. This gross inequality of bargaining power creates oppression, resulting in "no real negotiation and an absence of meaningful choice." *Flores*, 93 Cal. App. 4th at 853.

Furthermore, the element of surprise is satisfied by the design of LendVia's website, which obscures the drastic legal consequences of clicking the button. While LendVia's clickwrap interface mentions "binding arbitration," the actual terms are hidden behind a hyperlink, buried within a lengthy and prolix legal document. A consumer is not bound by "inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972).

By burying the oppressive terms, LendVia ensures that the reasonable expectations of the consumer are disappointed, satisfying the surprise element of procedural unconscionability.

### 2. The Agreement is Substantively Unconscionable.

The arbitration clause is also substantively unconscionable because its terms are shockingly one-sided and violates the public policy of California, Defendant's home state and the state whose law governs this inquiry.[2]

First, the provision is breathtakingly broad, seeking to bind consumers "for their entire lifetimes, for any type of wrong committed by Defendants." It purports to cover "any and all disputes or claims that have arisen or may arise," which would improperly sweep in claims, like Ms. Keller's, that predate the alleged agreement. Such a term falls far outside the reasonable expectations of any consumer. *Parada v. Superior Court*, 176 Cal. App. 4th 1554, 1573 (2009).

---

[2] California law governs the unconscionability analysis for several reasons. First, LendVia is a California company; it is headquartered in California, organized under its laws, and operates under a California Financing Law license. Second, federal courts apply state-law principles to determine contract validity, and California has the most significant relationship to a contract drafted and presented by a California-based entity. Finally, LendVia itself has argued in other federal courts that the validity of its clickwrap agreement should be determined under California law, and it should not be permitted to disavow that position now.

Second, and most dispositively, the arbitration agreement contains a waiver of public injunctive relief that is illegal under California law. The California Supreme Court's decision in *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017), holds that an arbitration provision is void as against public policy if it purports to waive a party's statutory right to seek public injunctive relief in *any* forum. A claim for public injunctive relief is one that primarily seeks to benefit the general public by preventing future harm. That is precisely what Ms. Keller seeks in her prayer for relief, which requests an injunction to stop LendVia from placing illegal robocalls to other consumers.

LendVia's arbitration clause runs directly afoul of the *McGill* rule. It states that "ANY RELIEF AWARDED CANNOT AFFECT OUR OTHER USERS." This language explicitly strips the arbitrator of the power to issue an injunction that would protect anyone other than the individual claimant, thereby functioning as a complete waiver of the right to seek public injunctive relief. Under *McGill*, such a provision is "contrary to California public policy and is thus unenforceable." 2 Cal. 5th at 952.

Because the agreement is an adhesion contract drafted to oppress consumers and contains substantively unconscionable terms—most notably an illegal waiver of public injunctive relief—it is unenforceable. The agreement is so "permeated by unconscionability" that severance is not an option, and the entire arbitration clause must be voided. *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 826 (2010).

### D. LendVia's Nationwide Pattern of Submitting Apparently Fabricated Consent Evidence Warrants Judicial Scrutiny.

This is not the first time LendVia has presented a court with dubious (and nearly identical) "Verified Consent" evidence to compel arbitration against a consumer who denies ever interacting with its websites. The motion before this Court is part of a calculated, cookie-cutter litigation strategy deployed in federal courts across the country. In case after case, LendVia files a nearly identical motion to compel arbitration, supported by the same type of "Verified

Consent" evidence, only to be met by a plaintiff who is mystified to see their name and personal information appear on a website they swear they never visited.

This recurring fact pattern is powerful circumstantial evidence that LendVia's "consent" platform is designed to manufacture fraudulent records, not to capture genuine user activity. For example:

- In *Newell v. LendVia, LLC*, in the Eastern District of Pennsylvania, LendVia filed a nearly identical motion to compel arbitration. The plaintiff, Journey Newell, responded with a sworn declaration stating, "I have never visited [the website at issue] upfinances.com and therefore never entered into the alleged agreement." (See, Newell Case Exhibits, 27-5 (Declaration at p. 110 of exhibit). Newell, 2:25-cv-01018-GJP (ED Pa, 2025).

- Likewise, in *Collins v. LendVia, et. al.,* in the Central District of California, multiple plaintiffs filed declarations making the same categorical denials. Plaintiff Bonnie Joe stated she never visited LendVia.com (27-6 at pp. 78-80); Plaintiff Richard Collins denied visiting the site (pp. 80-84); Plaintiff Maxx Lyman denied visiting the site (pp. 74-77); and Plaintiff Aaron Rapp denied visiting the site and showed that the IP address of the "consent certificate" tracked to a city two and a half hours away that he had not visited in 10 years.[3] (pp. 60-64). Each plaintiff was confronted with "Verified Consent" records containing their personal information, which they attested in sworn statements they did not provide. (See, Collins Case Exhibits, 27-6). Collins, 8:24-CV-01263-FWS-ADS.

This is not a series of coincidences; it is a clear pattern of conduct. The odds that multiple, unrelated consumers across the country would all suffer from the *exact same, specific*

---

[3] Rapp also attached as a TransUnion screenshot showing that his personal information had been accessed by Defendants, which likely explains how it was obtained for input into the "consent" website. (see, 27-6 at p. 66).

*amnesia*—forgetting a visit to a LendVia-affiliated website in which they input a wealth of personal information including their social security number — are infinitesimally small. Equally small are the chances that multiple, distinct consumers in different cases would be willing to perjure themselves. The far more logical conclusion, supported by the technical impossibilities in Ms. Keller's case (and many of the others), is that the evidence is fraudulent.[4]

Courts faced with this exact scenario have rightly refused to rubber-stamp LendVia's motions. In *Newell*, after the plaintiff detailed the technical impossibilities and denied visiting the website, the court did not compel arbitration. Instead, it recognized the existence of a genuine factual dispute over contract formation. The court denied LendVia's motion without prejudice and, crucially, ordered the parties to "conduct limited discovery concerning the validity and enforceability of the purported arbitration agreement." (Newell Order, 27-7). The court correctly applied the summary judgment standard, noting that where a party submits evidence to contest formation, the opposing party must be given the opportunity to obtain discovery before the court can rule.

In the present case, based on all of the above reasons, the Court should deny LendVia's motion outright and allow the case to proceed as normal. Alternatively, however, the Court may follow the same prudent course of the other courts who have considered this motion, including the Eastern District of Pennsylvania, denying the motion without prejudice, and permitting Ms. Keller to conduct limited discovery into the validity of LendVia's "Verified Consent" platform and the formation of the purported agreement.

### IV. CONCLUSION

For all the foregoing reasons, Plaintiff Michele Keller respectfully requests that this Court deny Defendant's Motion to Compel Arbitration in its entirety. In the alternative, should

---

[4] Moreover, the fact that Keller's personal information was entered **by *someone*** from an out-of-state IP address, on a device and cellular network not belonging to her, powerfully suggests *intentional fraud*—particularly given how readily such data can be obtained and misused by lenders targeting cold leads with questionable business practices.

14

the Court find that a genuine issue of material fact remains regarding contract formation, Plaintiff requests that the Court deny the motion without prejudice and permit limited discovery on the issue of whether a valid and enforceable agreement to arbitrate exists, consistent with the approach taken by other courts facing LendVia's identical motions

To do otherwise would be to reward a litigant for a systematic pattern of presenting what strongly appears to be fabricated evidence to the federal courts.

Respectfully submitted,

DAVE MAXFIELD, ATTORNEY, LLC

s/ David A. Maxfield

_____
Dave Maxfield, Esq., FED ID 6293
P.O. Box 11865
Columbia, SC 29211
(803) 509-6800
(855) 299-1656 (fax)
dave@consumerlawsc.com

Anthony I. Paronich
(Admitted Pro Hac Vice)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

*Attorneys for Plaintiff*

September 9, 2025